**<u>Public Copy—Sealed Material Deleted</u>**

**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5154**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

IN RE ATTORNEY GENERAL MERRICK GARLAND, IN HIS
OFFICIAL CAPACITY; UNITED STATES DEPARTMENT OF
JUSTICE; FEDERAL BUREAU OF INVESTIGATION DIRECTOR
CHRISTOPHER A. WRAY, IN HIS OFFICIAL CAPACITY;
FEDERAL BUREAU OF INVESTIGATION,

PETITIONERS.

———————————

**PETITION FOR A WRIT OF MANDAMUS
TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

MARK R. FREEMAN
GERARD SINZDAK
MARTIN TOTARO
*Attorneys, Appellate Staff
Civil Division, Room 7525
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-5048*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY.................................................................1

STATEMENT .........................................................................................5

ARGUMENT:

      This Court Should Exercise Its Mandamus Authority
      To Block the Deposition of the Former President.................................20

      A.    Mandamus Is Appropriate To Block Depositions of
           Former and Current High-Ranking Officials Absent
           Exceptional Circumstances ............................................21

      B.    The District Court Clearly Abused Its Discretion
           in Concluding That Extraordinary Circumstances
           Justified the Former President's Deposition ...............................25

      C.    The Petition Satisfies the Remaining Mandamus
           Factors..............................................................32

CONCLUSION...................................................................................35

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Cheney, In re,*
   544 F.3d 311 (D.C. Cir. 2008) ................................................................... 22, 25

*Cheney v. U.S. Dist. Court for D.C.,*
   542 U.S. 367 (2004) .................................................................................. 23, 33

*Clinton, In re,*
   973 F.3d 106 (D.C. Cir. 2020) ............................................ 5, 21, 22, 25, 26, 33

*Clinton v. Jones,*
   520 U.S. 681 (1997).........................................................................................23

*CTIA-The Wireless Ass'n v. FCC,*
   530 F.3d 984 (D.C. Cir. 2008) ........................................................................ 27

*Department of Commerce, In re*:
   139 S. Ct. 360 (2018) .............................................................................. 21, 23
   139 S. Ct. 566 (2018) ..................................................................................... 21

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) .................................................................................. 23, 24

*O'Donnell v. Barry,*
   148 F.3d 1126 (D.C. Cir. 1998) ...................................................................... 34

*Papandreou, In re,*
   139 F.3d 247 (D.C. Cir. 1998) ........................................................................ 22

*Peoples v. U.S. Dep't of Agric.,*
   427 F.2d 561 (D.C. Cir. 1970) ................................................................... 21, 22

*Pickering v. Board of Educ.,*
   391 U.S. 563 (1968).........................................................................................34

*Simplex Time Recorder Co. v. Secretary of Labor,*
   766 F.2d 575 (D.C. Cir. 1985) ................................................................ 3, 21, 25

*United States, In re,*
   624 F.3d 1368 (11th Cir. 2010) ...................................................................... 22

*United States, In re,*
   985 F.2d 510 (11th Cir. 1993) ........................................................ 31, 32

*U.S. Dep't of Educ., In re,*
   25 F.4th 692 (9th Cir. 2022) ........................................... 5, 20, 22, 24, 25, 26, 33

**Statute:**

28 U.S.C. § 1651 ...................................................................................... 1

**Rule:**

Fed. R. Civ. P. 45(d)(1) ........................................................................ 13

**Other Authorities:**

Office of the Inspector Gen., U.S. Dep't of Justice,
   *A Review of Various Actions by the Federal Bureau of*
   *Investigation and Department of Justice in Advance of*
   *the 2016 Election* (June 2018) ........................................................ 6, 7

Order, *In re Murthy*, No. 22-30697 (5th Cir. Jan. 5, 2023) .............................. 21

Order, *In re United States*, No. 14-5146 (D.C. Cir. July 24, 2014) .................. 22

## INTRODUCTION AND SUMMARY

In light of the significant separation of powers and institutional concerns raised by permitting unnecessary discovery from a former President relating to his official duties, the government respectfully requests that this Court issue a writ of mandamus directing the district court to quash the deposition of former President Donald Trump, which plaintiffs intend to schedule in the coming weeks. *See* 28 U.S.C. § 1651; Fed. R. App. P. 21.

This petition arises out of the Federal Bureau of Investigation's decision to dismiss Peter Strzok, a former senior FBI official, after an investigation by the Justice Department's Inspector General revealed that Strzok and another FBI employee, Lisa Page, had used their FBI-issued phones to send and receive thousands of inappropriate text messages, many of which criticized the former President and one suggesting they would stop then-candidate Trump from becoming President. Strzok and Page exchanged the text messages while assigned first to the FBI's investigation into former Secretary of State Clinton's use of a private email server and, later, to the FBI's investigation into Russia's efforts to interfere with the 2016 Presidential election. Strzok held a leadership role in both investigations. The eventual discovery and disclosure of Strzok's and Page's

Material Under Seal Deleted

inappropriate messages subjected the FBI to intense criticism and—by Strzok's own admission—caused lasting harm to the Bureau's reputation.

Although Strzok concedes the seriousness of his misconduct, he alleges that he was terminated not because of those actions, but rather at the urging of then-President Trump in retaliation for what Strzok maintains was constitutionally protected speech. Strzok has already deposed a litany of current and former high-ranking federal officials, including FBI Director Christopher Wray; former Deputy Attorney General Rod Rosenstein; former FBI Deputy Director David Bowdich; Justice Department Inspector General Michael Horowitz, and others. This extensive discovery revealed no substantial evidence in support of Strzok's theory that the FBI dismissed him because of pressure from President Trump. █████████████████

████████████████████████████████████████████████

█████████████

Nonetheless, the district court denied the government's motion to quash the deposition of former President Trump. The court did so over the government's repeated objection that such a deposition would be improper, and despite acknowledging that the assembled factual record left it uncertain what practical purpose such a deposition would serve. *See* Feb. 23, 2023 Tr.

2

13 (A19) (conceding that the "utility of and the necessity for [the former President's] deposition is less clear").

That deposition should be quashed. As this Court and others have recognized, depositions in civil litigation of current and former senior government officials about their official duties are permitted only in "extraordinary circumstances." *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985). The same stringent standard, at a minimum, should govern the deposition of a former President regarding his official actions taken while in office.

No such "extraordinary circumstances" exist here. It is undisputed that former FBI Deputy Director David Bowdich, not the former President, made the decision to terminate Strzok from the FBI. It is thus Bowdich's reasons and motivations for dismissing Strzok that are relevant to Strzok's claim, not the former President's. Strzok has already had ample opportunity to pursue discovery into Bowdich's reasons for his decision, including through depositions of Bowdich himself, Director Wray, and other senior FBI and Justice Department officials. ██████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ as the district court itself recognized, Bowdich has provided a robust and well-reasoned explanation for his decision to dismiss Strzok, leaving little basis on which a factfinder could justifiably conclude that Strzok was dismissed for reasons other than his own conceded misconduct.  *See* Feb. 23, 2023 Tr. 9 (A15).

The district court nonetheless allowed the former President's deposition to proceed, reasoning that it might be "of some relevance" to Strzok's claims if the former President "expressed his viewpoint [about Strzok] or issued directives during meetings in the Oval Office."  Feb. 23, 2023 Tr. 13 (A19).  That "some relevance" standard falls far short of establishing the type of exceptional circumstances that would allow a plaintiff to depose a former President about his official actions.  And in any event, the former President's views about Strzok were widely known and "broadly communicated."  *Id.*  The former President stated openly and publicly on numerous occasions that he believed the FBI should dismiss Strzok.  Strzok hardly needs to confirm whether the President expressed the same views in meetings in the Oval Office that he expressed publicly.

Nor would any such testimony cast doubt on Bowdich's account of his reasons for dismissing Strzok.  The former President's views are relevant to

**Material Under Seal Deleted**

this case only to the extent they were conveyed to the deciding officials at the

FBI, all of whom have already been deposed. ████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

This Court and others consistently grant mandamus relief to bar the

compelled deposition of current and former high-ranking executive officials.

*See, e.g., In re Clinton*, 973 F.3d 106, 112-13 (D.C. Cir. 2020); *In re U.S. Dep't

of Educ.*, 25 F.4th 692, 701 (9th Cir. 2022) (collecting cases).  The Court

should do the same here.

## STATEMENT

**1.**  This petition arises out of the FBI's termination of Special Agent

Peter Strzok, former Deputy Assistant Director of the FBI's

Counterintelligence Division.  In August 2015, Strzok was assigned to lead

the investigation into Secretary of State Clinton's use of a private email

server to conduct official business.  Compl. ¶15.  During that investigation,

5

Strzok worked with Lisa Page, an attorney serving as Special Counsel to the

FBI's Deputy Director.  In July 2016, Strzok and Page were assigned to

work on the FBI's investigation into the Russian government's efforts to

interfere in the 2016 Presidential election, with Strzok being "one of the key

members of that investigative team."  *Id.* ¶31; *see also* Dkt. No. 30-5, at 2

(No. 19-2367) (noting that Strzok was "assigned to lead" the Russia

investigation).  Later, both Strzok and Page served on Special Counsel

Robert Mueller's team investigating Russian interference in the election.

In early 2017, the Justice Department's Office of the Inspector General

began an examination of the FBI's and the Department's handling of the

email-server investigation.  During that examination, the Inspector General

identified over 40,000 text messages that Strzok and Page had exchanged on

FBI-issued phones while working on the email-server and Russian-

interference investigations.  *See* Compl ¶32; Office of the Inspector Gen.,

U.S. Dep't of Justice, *A Review of Various Actions by the Federal Bureau of*

*Investigation and Department of Justice in Advance of the 2016 Election*

395-96 (June 2018) (OIG Report).  Many of the texts between Strzok and

Page, which were commingled with texts about Strzok's work on the

investigations, were highly critical of former President Trump and described

him unfavorably.  For example, Strzok in 2016 described then-candidate Trump as a "disaster," "abysmal," "an idiot," and "unable to provide a coherent answer."  OIG Report 399-400.  In response to a text from Page expressing dismay about then-candidate Trump becoming President, Strzok stated that Trump would not become President because "[w]e'll stop" him from taking office.  *Id.* at 404.  The OIG Report emphasized that these and other text messages "demonstrated extremely poor judgment and a gross lack of professionalism."  *Id.* at xii.  The Report further concluded that Strzok's and Page's conduct "brought discredit to themselves, sowed doubt about the FBI's handling of the [email-server] investigation, and impacted the reputation of the FBI."  *Id.* at xi.  The Report emphasized that "the damage caused by their actions extends far beyond the scope of the [email-server] investigation and goes to the heart of the FBI's reputation for neutral factfinding and political independence."  *Id.*  The Special Counsel removed Strzok from his investigation in July 2017, after learning about the texts.  *Id.* at 397.

In early December 2017, the press reported on the texts and "several Senate and House committee chairs" requested them.  Dkt. No. 38-1, ¶8 (Rosenstein Decl.).  Until that time, the basis for Strzok's removal from the

7

Special Counsel's team had not been publicly reported.  Deputy Attorney General Rod Rosenstein discussed with career and political Department officials whether Congress had a legitimate oversight interest in the texts, whether any countervailing law-enforcement interest could justify withholding them, and whether Strzok and Page had any privacy interests in the messages despite sending the messages on their FBI-issued phones.  *Id.* ¶¶9-14.  Rosenstein decided to release redacted versions of the texts pursuant to congressional requests.  *Id.*  After confirming with the Department's privacy expert that doing so would not violate the Privacy Act, Rosenstein agreed with the Department's Office of Public Affairs' recommendation to also "provid[e] the text messages to the media because otherwise, some congressional members and staff were expected [to] release them intermittently before, during, and after [a hearing with Rosenstein scheduled the following day], exacerbating the adverse publicity for Mr. Strzok, Ms. Page, and the Department."  *Id.* ¶15.  Rosenstein later explained that, "[i]f [he] had believed that the disclosure was prohibited by the Privacy Act, [he] would have ordered Department employees not to make the disclosure."  *Id.* ¶19.

**2.** The FBI's Office of Professional Responsibility initiated an investigation into Strzok's misconduct. In June 2018, Office staff recommended that the FBI dismiss Strzok based on its finding that he violated FBI regulations when he: (1) engaged in unprofessional conduct by making inappropriate political comments in text messages on his FBI-issued cell phone; (2) used a personal email account to conduct official FBI business; and (3) failed to diligently pursue a credible lead when new information was brought forth regarding the private server investigation. Dkt. No. 30-5, at 1; *see id.* at 4-11 (excerpting text messages Strzok exchanged on his FBI-issued phone). Page had already resigned when Office staff made its recommendation.

Strzok provided a written response to the recommendation that he be terminated and participated in a subsequent disciplinary hearing. Dkt. No. 30-5, at 18. Strzok conceded that his text exchanges "without question" represented "horrible judgment." *Id.* He also acknowledged that the disclosure of the messages caused significant damage to the FBI's reputation. *Id.* As a penalty for that misconduct, he proposed to receive, in lieu of dismissal, a suspension and a demotion to a non-supervisory position.

9

Dkt. No. 30-6.  He submitted a "Last Chance" Adjudication Agreement to that effect.  *Id.*

The career Assistant Director for the FBI's Office of Professional Responsibility, Candice Will, reviewed the allegations and Strzok's response, substituted a charge concerning dereliction of supervisory responsibility for the charge concerning failure to diligently pursue an investigative lead, and concluded that the three charges against Strzok were "substantiated."  Dkt. No. 30-5, at 1, 23.  Will found that Strzok's "excessive, repeated, and politically-charged text messages, while [he] w[as] assigned as the lead case agent on the FBI's two biggest and most politically-sensitive investigations in decades, demonstrated a gross lack of professionalism and exceptionally poor judgment."  *Id.* at 19.  Will further found that Strzok's misconduct "caused immeasurable harm to the Bureau's reputation with [the Department of Justice], other government officials, and the American public."  *Id.* at 22.  Will determined that the "nature and scope of the misconduct certainly warrant[ed] dismissal."  *Id.* at 23.  But she chose the lesser penalty of a 60-day suspension without pay and demotion in light of Strzok's long career and his "profound[ ] remorse[ ]."  *Id.*

Pursuant to his authority as Deputy Director of the FBI—the highest-ranking career official within the FBI—David Bowdich "reconsidered the [Assistant Director's] punishment and conclude[d] that dismissal [wa]s appropriate under the facts of this case." Dkt. No. 30-7, at 1. Bowdich reinstated the original staff recommendation of dismissal "given the severe, long-term damage [Strzok's] conduct has done to the reputation of the FBI," noting that "[i]t is difficult to fathom the repeated, sustained errors of judgment [Strzok] made while serving as the lead agent on two of the most high-profile investigations in the country." *Id.* at 1-2. Bowdich explained that he "could not recall another incident like [Strzok's] that brought such discredit on the organization." *Id.* at 2. In Bowdich's "23 years in the FBI," he "ha[d] not seen a more impactful series of missteps that has called into question the entire organization and more thoroughly damaged the FBI's reputation." *Id.* ("In our role as FBI employees we sometimes make unpopular decisions, but the public should be able to examine our work without having to question our motives.").

**3.** Following his termination, Strzok filed suit in federal court against the Attorney General and the Director of the FBI, in their official capacities, as well as the Justice Department and the FBI. Compl. ¶¶9-12. Strzok

11

alleges that defendants retaliated against him in violation of the First
Amendment when they dismissed him, *id.* ¶¶72-74, and that the manner in
which he was terminated deprived him of due process, *id.* ¶¶76-77. He
further alleges violations of the Privacy Act based on alleged disclosures of
his text messages to the news media. *Id.* ¶¶79-82. Page also brought suit,
claiming that the disclosure of the text messages to the press violated the
Privacy Act. The cases have been consolidated for purposes of discovery.

The parties have engaged in extensive discovery. Defendants have
produced thousands of pages of documents, and Strzok has deposed
numerous witnesses, including current FBI Director Christopher Wray;
former Deputy Attorney General Rod Rosenstein; former FBI Deputy
Director David Bowdich; former Assistant Director of the FBI's Office of
Professional Responsibility Candice Will; former Associate Deputy Attorney
General Scott Schools; and Justice Department Inspector General Michael
Horowitz. And Strzok interviewed and obtained a declaration from the
former President's Chief of Staff during the relevant time period, General
John Kelly.

Strzok also subpoenaed former President Trump to sit for a deposition.
Although Strzok did not name the former President as a defendant, his

complaint alleges that "Trump directly and indirectly pressured FBI Director Wray and then-Attorney General Sessions to fire Special Agent Strzok." Compl. ¶45. In support of that allegation, the complaint cites a number of public statements made by the former President advocating for Strzok's termination. The complaint notes, for example, that then-President Trump publicly questioned why Strzok was "still" at the FBI following Page's resignation. *Id.* ¶47. Trump also allegedly accused Strzok of "treason" and told reporters at the White House that he was "amazed that Peter Strzok is still at the FBI" and that "Strzok should have been fired a long time ago." *Id.* ¶¶46, 47. When Strzok was dismissed, Trump tweeted "finally." *Id.* ¶46. The complaint alleges that, "[b]ut for the intervention of the President and his political allies and their insistence on punishing Special Agent Strzok for the content of his protected speech" in his texts, the FBI would not have terminated him. *Id.* ¶48. Strzok additionally alleges that the former President has taken credit for his dismissing in public statements made following his termination.

The government moved to quash the subpoena of the former President in the Southern District of New York because that venue was the place of compliance for the subpoena. Fed. R. Civ. P. 45(d)(1). The court transferred

13

Material Under Seal Deleted

the motion, by consent, to the U.S. District Court for the District of Columbia. *See* Order, *In re Subpoena Served on Donald Trump*, No. 22-27 (D.D.C. Feb. 1, 2022). That matter has not been consolidated with the Strzok and Page suits, but the district court has treated it as a related case.

Discovery continued as the district court considered the government's motion to quash. As particularly relevant here, plaintiffs deposed former Deputy Director Bowdich in the intervening months. During that deposition, Bowdich ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



4.  In February 2023, the district court denied from the bench the government's motion to quash the deposition of former President Trump (as well as the government's motion to quash the deposition of sitting FBI Director Christopher Wray, a decision that the government did not subsequently challenge).  *See* Feb. 23, 2023 Tr. (A7-46); Feb. 23, 2023 Minute Order (A3).  The court acknowledged the well-established principle that a "top executive department official should not, absent extraordinary circumstances, be called to testify regarding [his] reasons for taking official actions."  Feb. 23, 2023 Tr. 6 (A12).  The court also recognized that Bowdich's testimony explaining his reasons for dismissing Strzok does not "leave[ ] much wiggle room at all for a factfinder to conclude that he did what he did because Christopher Wray told him to or because Christopher Wray

15

conveyed a message from the then President, or because he thought the President had directed him to." *Id.* The court further found that "[t]he utility of and the necessity for" Trump's deposition was not altogether "clear" given that the former President's "views on the subject were broadly communicated." *Id.* at 13 (A19); *see also id.* at 9-10 (A15-16) (noting that former President Trump was "quite vocal and public about what he wanted" and that "it wasn't necessary for Mr. Wray to tell anybody what the President was thinking").

The district court nevertheless found that extraordinary circumstances warranted allowing Strzok to depose the former President. The court reasoned that former President Trump's "own contemporaneous and recent statements concerning his role make the inquiry legitimate and likely to lead to relevant evidence that can't be obtained elsewhere, even if it isn't ultimately fruitful." Feb. 23, 2023 Tr. 13 (A19). "It is of some relevance," the court continued, "if he expressed his viewpoint or issued directives during meetings in the Oval Office." *Id.* The court also observed that Trump "has personally initiated civil lawsuits during his post presidency period," which in the court's view "suggest[ed] that his schedule as a former president and

16

current candidate can withstand the modest demands on his time that a

deposition would impose." *Id.* at 14 (A20).

The court permitted a two-hour deposition of the former President,

limited to the following topics:

- A January 22, 2018 meeting between Trump, Wray, and then-Attorney General Jeff Sessions, "but only with respect to discussions at that meeting of the text messages between the two plaintiffs or the two plaintiffs in general, disciplining them, investigating them, et cetera." Feb. 23, 2023 Tr. 14-15 (A20-21);

- A January 23, 2018 meeting between Trump and Sessions, "but, again, only with respect to any discussions of the plaintiffs," *id.* at 15 (A21);

- A June 15, 2018 meeting purportedly between Trump, Wray, Rosenstein, and others, but "limited to any discussion of the fate of the plaintiffs, their employment status or likely discipline," *id.*;

- Trump's "own public statements and communications about the plaintiffs" from December 2, 2017, to the present, *id.*; *see id.* at 15-16 (A21-22); and

- Whether Trump "retained the text messages, where he got them, [and] what he did with them," *id.* at 16 (A22).

Following the district court decision and at the request of the court, the

government informed the court that the "Executive Office of the President

will not assert the Presidential Communications Privilege, and Defendants

will not assert the Deliberative Process Privilege, with respect to the

authorized topics" in any Trump or Wray deposition.  Dkt. No. 108, at 2.

17

**Material Under Seal Deleted**

**5.** The government filed a motion in district court to stay its order permitting the deposition of the former President or, alternatively, to order that the former President not be deposed until after the deposition of Director Wray (and any ensuing motion practice as to the remaining necessity of the former President's deposition).  Dkt. No. 110.  The district court ordered "that the deposition of Christopher Wray proceed first."  May 12, 2023 Minute Order (A4).

During his deposition, Director Wray testified that ███████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████

███████████████████████████████████████████

████████

    After the Wray deposition, ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████, the government moved

for reconsideration of the court's denial of the government's motion to quash

the subpoena for the deposition of former President Trump.  The court

denied the government's motion without waiting for a response from

plaintiffs.  In doing so, the court acknowledged that, "to the extent the

individuals deposed to date recalled the events in question, their testimony

did not advance plaintiffs' theory that the former President was involved in

the decision making at issue in this case."  July 6, 2023 Minute Order (A6).

But the court allowed the deposition to proceed based on its previously

stated view that "the former President himself has publicly boasted of his

involvement."  *Id.*[1]

---

[1] The proceedings in this case pertaining to the Trump and Wray
deposition subpoenas have been conducted under seal.  At the parties'

*Continued on next page.*

**Material Under Seal Deleted**

## ARGUMENT

### This Court Should Exercise Its Mandamus Authority
### To Block the Deposition of the Former President

Only the most extraordinary of circumstances would justify allowing a plaintiff to depose a former high-level official about actions he took in the course of his official duties.  This case falls far short of that standard.  Peter Strzok, while leading two of the most important and politically sensitive investigations in the recent history of the FBI, unquestionably engaged in misconduct that, all agree, caused incalculable harm to the Bureau.  The FBI reasonably concluded that such misconduct by a member of its leadership team warranted dismissal. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*See* July 6, 2023 Minute Order (A6) (recognizing that, "to the extent the individuals deposed to date recalled the events in question, their testimony

---

request, the district court unsealed relevant portions of the transcript of the February 23, 2023 hearing at which the court denied the government's motion to quash to the former President's deposition.  The government has requested that plaintiffs agree to remove the confidentiality designations of additional materials cited in this petition, where feasible, and the parties continue to engage on these issues.

20

did not advance plaintiffs' theory that the former President was involved in the decision making at issue in this case").

Federal courts of appeals consistently exercise their mandamus authority to block district court orders requiring the deposition of current and former high-ranking Executive Branch officials. *See, e.g.*, *In re Department of Commerce*, 139 S. Ct. 360 (2018) (No. 18A375) (staying deposition of Commerce Secretary); *In re Department of Commerce*, 139 S. Ct. 566 (2018) (No. 18-557) (treating petition for writ of mandamus as petition for writ of certiorari, and granting petition); Order, *In re Murthy*, No. 22-30697 (5th Cir. Jan. 5, 2023) (per curiam) (staying deposition of former White House Press Secretary) (Psaki Order); *In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022) (granting mandamus to quash deposition of former Secretary of Education); *In re Clinton*, 973 F.3d 106 (D.C. Cir. 2020) (granting mandamus to quash deposition of former Secretary of State). This Court should do the same here.

### A.    Mandamus Is Appropriate To Block Depositions of Former and Current High-Ranking Officials Absent Exceptional Circumstances

It is well-settled that "top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their

reasons for taking official actions." *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985). Allowing depositions of those officials in civil litigation—to say nothing of a current or former President— is "not normally countenanced," *Peoples v. U.S. Dep't of Agric.*, 427 F.2d 561, 567 (D.C. Cir. 1970), and is "quite unusual," *In re Papandreou*, 139 F.3d 247, 253 (D.C. Cir. 1998); *see, e.g.*, *In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008) (per curiam) (Vice President's Chief of Staff). That is because "the compelled appearance of a high-ranking officer of the executive branch in a judicial proceeding implicates the separation of powers." *In re United States*, 624 F.3d 1368, 1372 (11th Cir. 2010); *U.S. Department of Education*, 25 F.4th at 702 (emphasizing that a judicial order allowing the deposition of a current or former high-ranking Executive Branch official threatens to "disrupt the normal governmental balance of powers").

Courts, including this Court, consistently grant mandamus relief to enforce this rule. *See, e.g.*, *Cheney*, 544 F.3d 311; *Clinton*, 973 F.3d at 121; Order, *In re United States*, No. 14-5146 (D.C. Cir. July 24, 2014) (per curiam) (Secretary of Agriculture) (Vilsack Order); *U.S. Department of Education*, 25 F.4th at 701 ("Although district courts have occasionally ordered such depositions, circuit courts have issued writs of mandamus to stop them when

22

asked to, generally finding that the circumstances before them were not extraordinary.") (collecting cases); *cf. In re Department of Commerce*, 139 S. Ct. 360 (2018) (No. 18A375) (staying deposition of Commerce Secretary).

The separation-of-powers concerns inherent in all depositions of high-level Executive Branch officials are near their zenith where, as here, plaintiffs seek to depose a former President about his official conduct while in office.  "The President occupies a unique position in the constitutional scheme"; one that "distinguishes him from other executive officials." *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 750 (1982).  In light of the "special nature of the President's constitutional office and functions" and "the singular importance of [his] duties," separation-of-powers principles require particular "deference and restraint" in the conduct of litigation involving the President.  *Id.* at 751-56; *see also Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 382, 385, 388 (2004) (emphasizing that discovery directed at the Office of Vice President raised "special considerations" regarding "the Executive Branch's interests in maintaining the autonomy of its office," the "energetic performance" of the Commander-in-Chief 's "constitutional responsibilities," and "[t]he high respect that is owed to the office of the

Chief Executive" (alteration in original) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997))).

That this case involves the deposition of a former President, rather than a sitting President, does not diminish the separation-of-powers concerns.  Strzok seeks to depose former President Trump about his official conduct in office.  That claim implicates the interests and autonomy of the Office of the President and of the Executive Branch more broadly.  Indeed, the foundational case about a President's immunity from civil damages for conduct in office, *Nixon v. Fitzgerald*, likewise involved a former President. As courts have explained in granting mandamus to preclude the deposition of former high-ranking cabinet officials, "[t]he threat of having to spend their personal time and resources preparing for and sitting for depositions could hamper and distract officials from their duties while in office." *U.S. Department of Education*, 25 F.4th at 705.  That rationale applies with even greater force to the President "[i]n view of the visibility of his office and the effect of his actions on countless people." *Nixon*, 457 U.S. at 752.  A President should not have to perform his official duties while in office in the expectation of regularly being subpoenaed to testify in civil litigation after his term in office ends.

24

Even where a President is not involved, a party must overcome a high bar to demonstrate the "extraordinary circumstances" necessary to depose a current or former high-level official regarding actions taken pursuant to official duties. *Simplex Time Recorder*, 766 F.2d at 586. No extraordinary circumstances exist where "information . . . could be obtained elsewhere." *Cheney*, 544 F.3d at 314; *see Simplex Time Recorder*, 766 F.2d at 587 (party did not show that information was unavailable "from published reports and available agency documents"); *U.S. Department of Education*, 25 F.4th at 704 ("[T]o take the deposition of a cabinet secretary, the information sought cannot be obtainable in any other way."). In other words, the deposition may not proceed unless it is "essential to the case." *U.S. Department of Education*, 25 F.4th at 703.

### B. The District Court Clearly Abused Its Discretion in Concluding That Extraordinary Circumstances Justified the Former President's Deposition

The district court committed a clear abuse of discretion in authorizing Strzok to depose the former President. The permissible topics for the deposition—White House meetings where plaintiffs may have been discussed; former President's Trump's public statements about plaintiffs as well as any related communications about his statements with the

Department of Justice or the FBI; etc.—concern the former President's actions in the course of his official duties as President. The court accordingly did not dispute that the presumption against compelled testimony of a high-ranking official applied here. But it committed a "clear abuse of discretion" that "justif[ies] mandamus," *Clinton*, 973 F.3d at 111, when it determined that this case presents "extraordinary circumstances" warranting the deposition of the former President, Feb. 23, 2023 Tr. 12 (A18).

The former President's testimony is not "essential" to Strzok's retaliation claim, *U.S. Department of Education*, 25 F.4th at 703, nor could it yield information vital to Strzok's claim that is unavailable from any other source. Strzok challenges the reasons for his termination from the FBI. It is undisputed that former FBI Deputy Director David Bowdich, not former President Trump, made the decision to dismiss Strzok. *E.g.*, Compl. ¶3 ("The discharge decision was made by Deputy Director David Bowdich . . . ."). It is thus Bowdich's motives for dismissing Strzok that are relevant to Strzok's retaliation claim. Strzok has had ample opportunity to explore those motives directly, including through depositions of Bowdich himself, FBI Director Wray, former Deputy Attorney General Rod Rosenstein, Justice Department Inspector General Michael Horowitz, and others.

26

Despite this extensive discovery Strzok has identified no evidence that would undermine Bowdich's stated, plainly sufficient, non-retaliatory reasons for Strzok's termination. *Cf, CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 989 (D.C. Cir. 2008) ("[W]e have long presumed that executive agency officials will discharge their duties in good faith.").  Indeed, the district court recognized that Bowdich's stated reasons for dismissing Strzok (*i.e.*, that Strzok engaged in serious, acknowledged, and damaging misconduct), as conveyed in his letter terminating Strzok and ████████████████████, did not "leave[ ] much wiggle room at all for a factfinder to conclude that [Bowdich] did what he did because Christopher Wray told him to or because Christopher Wray conveyed a message from the then President, or because he thought the President had directed him to."  Feb. 23, 2023 Tr. 9 (A15).

That conclusion has since become even more plain.  ██████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████████

27

**Material Under Seal Deleted**



Moreover, former White House Chief of Staff John Kelly has since similarly stated that he never recalled former President Trump asking "FBI Director Christopher Wray, FBI Deputy Director David Bowdich, or anyone else at the FBI" to dismiss or investigate Strzok or Page.  Dkt. No. 115-1, Ex. C ¶¶1, 4, 5.  Kelly also noted that he "did not take any action to put into effect, or cause to be put into effect, former President Trump's expressed views with respect" to Mr. Strzok or Ms. Page, and that he is not "aware of anyone else doing so."  *Id.* ¶11.

The district court had all of this information before it when it nonetheless decided to allow the deposition to proceed.  In its ruling denying the government's motion to quash, the district court stated that "the President's own contemporaneous and recent statements concerning his role

28

**Material Under Seal Deleted**

make the inquiry legitimate and likely to lead to relevant evidence that can't be obtained elsewhere," and "[i]t is of some relevance if he expressed his viewpoint or issued directives during meetings in the Oval Office."  Feb. 23, 2023 Tr. 13 (A19); *see also* July 6, 2023 Minute Order (A6) (acknowledging that, "to the extent the individuals deposed to date recalled the events in question, their testimony did not advance plaintiffs' theory that the former President was involved in" Strzok's termination, but nonetheless permitting the deposition on the ground that "the former President himself has publicly boasted of his involvement").

This gets matters backwards.  The former President's repeated public statements criticizing Strzok and expressing his strong desire that Strzok be dismissed undermine any basis for the deposition.  The former President's statements made his views on the matter pellucidly clear, "broadly communicated," and widely known.  Feb. 23, 2023 Tr. 13 (A19). █████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████ As the district court recognized, therefore, it "wasn't necessary for" FBI Director Wray or any other senior officials who met with the President in the Oval Office to tell Bowdich "what the President was

thinking." Feb. 23, 2023 Tr. 9-10 (A15-16). Everyone knew what the President thought. The question at the core of this case is whether there is any basis to second-guess ████████████████████████████████ ████████████████████████████████ based on the nature and extent of Strzok's misconduct in his improper texts with Page and the damage that he caused to the FBI.

Strzok has in his possession all the information he needs to make his legal argument on that score. He is free to argue, if he wishes, that the testimony of ████████████████████████████████ should not be believed and that President Trump's desire to see Strzok dismissed was the true reason for his termination. In the government's view, ████████ ████████████████████████████████████████ ████████████████████████████████ refutes that claim. In no event, however, is a deposition of the former President necessary for Strzok to make that argument. At most, such a deposition would show that the former President privately expressed views consistent with his public statements—████████████████████████ ████████████████████████████

30

The former President's public statements purportedly "boast[ing] of his involvement" in Strzok's termination, *see* July 6, 2023 Minute Order (A6), are likewise beside the point.  As discussed above, ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ *See supra* pp.  14-15, 18.  How the former President himself might now characterize his role in Strzok's termination is thus irrelevant to Strzok's retaliation claim.  The fact that Strzok may ████████

███████████████ about the reasons for his decision is not an "exceptional circumstance" warranting the deposition of a former President.

The district court further erred in attempting to justify its ruling based on the limitations it placed on the duration and scope of the deposition of the former President.  That reasoning gives insufficient weight to the separation-of-powers principles at stake in allowing the deposition to proceed in the first place.  Courts have rejected similar arguments in the context of depositions of senior agency officials.  *See In re United States*, 985 F.2d 510, 511-13 (11th Cir. 1993) (per curiam) (explaining that the court issued a writ of mandamus to quash an order directing the Commissioner of the Food and Drug Administration "to be available for thirty minutes" by telephone because,

31

even given that significant limitation, compelling the testimony of the
Commissioner of the Food and Drug Administration "'would have [had]
serious repercussions for the relationship between two coequal branches of
government.'" (quoting *In re United States*, 985 F.2d at 510)). The
separation-of-powers injury here is inflicted by the deposition itself and the
court-sanctioned inquiry into the former President's conduct while in office.
That threshold harm cannot be cured by placing guardrails around the
duration and scope of the deposition.[2]

### C.    The Petition Satisfies the Remaining Mandamus Factors

The remaining two mandamus factors—whether the issuance of the
writ is appropriate under the circumstances and whether the petitioner has
no other adequate means to obtain relief—are also satisfied. This Court has

---

[2] Plaintiffs also claim that "President Trump's testimony is likely to be
highly relevant to the Privacy Act claims" brought by Strzok and Page
because "President Trump has long been fixated on—and in some instances
personally involved in—matters relating to Ms. Page and Mr. Strzok." Dkt.
No. 111, at 7. But former Attorney General Rod Rosenstein, not former
President Trump, decided to release texts sent between Strzok and Page on
their FBI-issued phones. Rosenstein has already explained that he did so
based on his own analysis after consulting with Department of Justice
officials to ensure that the release would not violate the Privacy Act.
Rosenstein Decl. ¶¶8-15. Plaintiffs' attempt to force former President
Trump to sit for a deposition is no more justified for their Privacy Act claims
than for Strzok's retaliation claim.

made clear that mandamus is appropriate when a court orders the deposition of a current or former high-level official concerning actions taken while in office. *E.g.*, Vilsack Order, *supra* (third-party subpoena); *Clinton*, 973 F.3d at 117-18. Other courts have likewise "routinely found that, in cases involving high-level government officials, there are no other means of relief beyond mandamus because to disobey the subpoena, face contempt charges, and then appeal would not be appropriate for a high-ranking government official." *U.S. Department of Education*, 25 F.4th at 705; *see id.* ("[S]erious repercussions for the relationship between two coequal branches of government can remain even if the official is no longer in office when the official faces the subpoena because of their role in the executive branch."); Psaki Order, *supra*. And the "totality of the circumstances" factor also "merits granting the writ," *Clinton*, 973 F.3d at 117-18, given the weighty separation-of-powers interests at stake, *see U.S. Department of Education*, 25 F.4th at 705-06; *Cheney*, 542 U.S. at 382.

Mandamus is particularly warranted here given the weakness of Strzok's retaliation claim. To state a claim of retaliation in violation of the First Amendment, a public employee must show, among other things, that the "governmental interest in 'promoting the efficiency of the public services

33

it performs through its employees'" does not outweigh the "employee's interest, 'as a citizen, in commenting upon matters of public concern' and the interest of potential audiences in hearing what the employee has to say." *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998) (citation omitted) (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)).  It is far from clear that Strzok, a senior FBI agent charged with leading highly sensitive investigations, had a constitutionally protected interest in sharing his political views with a co-worker on his FBI-issued cellphone, especially given that the investigations concerned the major-party candidates for the presidency.  But even assuming he possessed such an interest, it was far outweighed by the FBI's interest in protecting its integrity, impartiality, and reputation by making clear to its employees and the public that the damaging misconduct committed by Strzok demanded his termination.

Indeed, it is undisputed that Strzok's actions, undertaken while he was leading two prominent, politically sensitive investigations, caused immense harm to the FBI.  *See* Dkt. No. 30-5, at 23; *see also* Dkt. No. 30-7, at 1-2 (concluding that Strzok's "repeated, sustained errors of judgment" were the most damaging acts to the FBI's reputation by an employee that Bowdich had seen in his 23 years at the agency).  As Strzok acknowledged, the text

exchanges "without question" represented "horrible judgment" and the

disclosure of the messages caused significant damage to the FBI's

reputation.  Dkt. No. 30-5, at 18.  The plainly flawed nature of Strzok's claim

renders the district court's decision to permit him to depose the former

President in service of that claim all the more unjustified.

**CONCLUSION**

The petition for a writ of mandamus should be granted.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

MARK R. FREEMAN
GERARD SINZDAK
 */s/ Martin Totaro*
MARTIN TOTARO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
  *martin.v.totaro@usdoj.gov*

July 2023

35

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.     Parties and Amici

Plaintiffs in district court, and respondents here, are Peter Strzok and Lisa Page.

Defendants in district court, and petitioners here, are Attorney General Merrick Garland, in his official capacity; the United States Department of Justice; FBI Director Christopher A. Wray, in his official capacity; and the Federal Bureau of Investigation.

There were no amici in district court.

Former President Donald Trump is not a party or amicus but is the subject of the third-party deposition subpoena at issue here.

### B.     Rulings Under Review

Petitioner seeks review of the February 23, 2023 Minute Order and the February 23, 2023 oral ruling of the U.S. District Court for the District of Columbia in *Strzok v. Garland*, No. 19-2367 (D.D.C.) (Jackson, J.), and a July 6, 2023 Minute Order denying reconsideration of the February 23 rulings. Those rulings are reproduced at A3, A6, and A7.

C.    **Related Cases**

The case on review has not previously been before this Court or any

other court, except the district court where it originated.  Counsel for the

government is not aware of any related cases within the meaning of D.C.

Circuit Rule 28(a)(1)(C).

/s/ *Martin Totaro*
Martin Totaro

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume and typeface/typestyle limitations of Federal Rule of Appellate Procedure 21(d) because it contains 7162 words (excluding exempted matter) according to the count of Microsoft Word, and has been prepared in proportional CenturyExpd BT 14-point font.

## CERTIFICATE OF SERVICE

I certify that, on July 11, 2023, I electronically filed a public version of this petition through this Court's CM/ECF system.  I also certify that eight copies of the sealed petition and eight copies of the public petition will be hand-delivered today to the D.C. Circuit.

I further certify that, on July 11, 2023, four copies of the attached petition (two copies of the public petition and two copies of the sealed petition) were served on the following counsel by e-mail and by first-class mail:

Aitan D. Goelman
Christopher R. MacColl
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
AGoelman@zuckerman.com
CMacColl@zuckerman.com
*Counsel for Peter Strzok*

Richard A. Salzman
Heller, Huron, Certkof & Salzman PLLC
1730 M Street NW, Suite 412
Washington, DC 20036
salzman@hellerhuron.com

Amy Jeffress
Robert Katerberg
Kaitlin Konkel
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Amy.jeffress@aporter.com
Robert.katerberg@arnoldporter.com
Kaitlin.konkel@arnoldporter.com
*Counsel for Lisa Page*

Finally, I certify that, on July 11, 2023, four copies of the attached

petition (two copies of the public petition and two copies of the sealed

petition) were sent to the Honorable Amy Berman Jackson, U.S. District

Court Judge for the District of Columbia, by hand delivery.

*/s/ Martin Totaro*
Martin Totaro