Public Copy—Sealed Material Deleted

**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5154**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

IN RE ATTORNEY GENERAL MERRICK GARLAND, IN HIS
OFFICIAL CAPACITY; UNITED STATES DEPARTMENT OF
JUSTICE; FEDERAL BUREAU OF INVESTIGATION DIRECTOR
CHRISTOPHER A. WRAY, IN HIS OFFICIAL CAPACITY;
FEDERAL BUREAU OF INVESTIGATION,

Petitioners.

---

**RESPONSE OF PETER STRZOK AND LISA PAGE IN OPPOSITION
TO PETITION FOR A WRIT OF MANDAMUS TO THE
U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

---

Amy Jeffress
Robert J. Katerberg
Kaitlin Konkel
**ARNOLD & PORTER KAYE
SCHOLER LLP**
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
Amy.Jeffress@arnoldporter.com
Robert.Katerberg@arnoldporter.com
Kaitlin.Konkel@arnoldporter.com

Aitan D. Goelman
Christopher R. MacColl
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite
1000
Washington, DC 20036
(202) 778-1800
agoelman@zuckerman.com
cmaccoll@zuckerman.com

Richard A. Salzman
**HELLER, HURON, CHERTKOF
& SALZMAN PLLC**
1010 Wayne Ave., Suite 510
Silver Spring, MD 20910
(202) 293-8090
salzman@hellerhuron.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.      Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Petition.

**B.      Rulings Under Review**

References to the rulings at issue appear in the Petition.

**C.      Related Cases**

The case on review has not previously been before this Court.  The rulings under review were issued in *Strzok v. Garland*, Case No. 1:19-cv-2367 (D.D.C.), *Page v. U.S. Department of Justice*, Case No. 1:19-cv-3675-TSC (D.D.C.), and *In re Subpoena Served on Donald J. Trump*, 1:22-mc-27 (D.D.C.).  Respondents are not aware of any other related case within the meaning of Circuit Rule 28(a).

s/ Aitan D. Goelman
Aitan D. Goelman

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION AND SUMMARY ...................................................1

STATEMENT ......................................................................................5

I.      Procedural History ...................................................................5

II.     Factual Background ..................................................................9

        A. Defendants disclose Plaintiffs' text messages to the press ..................9

        B. Trump launches his campaign to destroy Plaintiffs' reputations
           and get Strzok fired ...........................................................11

        C. Trump's efforts succeed when the FBI reverses its independent
           disciplinary office's suspension of Strzok in an unprecedented
           move .............................................................................15

REASONS FOR DENYING THE PETITION ....................................18

I.      Defendants cannot meet the high bar of showing that the district
        court's carefully tailored discovery orders amounted to a judicial
        usurpation of power ...............................................................18

        A. The district court acted well within its authority to manage
           discovery matters............................................................18

        B. Mandamus is unavailable where, as here, there is no showing of
           irreparable harm .............................................................20

II.     It is not clear and indisputable that the "extraordinary circumstances"
        test applies ...........................................................................23

        A. The former president was not the official decisionmaker, and
           the deposition is not about his deliberative process...........................24

    B. By declining to assert the privileges that safeguard the separation of powers, Defendants have effectively conceded that no separation-of-powers concerns exist ........................................25

    C. No binding precedent or persuasive authority clearly and indisputably establishes that extraordinary circumstances are required to depose a former official ....................................................26

III. Regardless, extraordinary circumstances justify the limited deposition of Mr. Trump ...........................................................................................29

CONCLUSION ....................................................................................................33

CERTIFICATE OF COMPLIANCE .......................................................................35

CERTIFICATE OF SERVICE ..............................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berry v. Dist. of Columbia*,
833 F.2d 1031 (D.C. Cir. 1987) ........................................................ 20

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ........................................................... 1, 18, 22

*Cruz v. McAleenan*,
931 F.3d 1186 (D.C. Cir. 2019) ........................................................ 31

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ........................................................ 25

*Forsyth Cnty., Ga. v. Nationalist Movement*,
505 U.S. 123 (1992) ........................................................ 31

*Illinois v. Ferriero*,
60 F.4th 704 (D.C. Cir. 2023) ........................................................ 1

*In re al-Nashiri*,
791 F.3d 71 (D.C. Cir. 2015) ........................................................ 33

*In re Cheney*,
406 F.3d 723 (D.C. Cir. 2005) ........................................................ 1

*In re Cheney*,
544 F.3d 311 (D.C. Cir. 2008) ........................................ 18, 20, 25, 26, 32

*In re Clinton*,
973 F.3d 106 (D.C. Cir. 2020) ........................................................ 29

*In re Exec. Off. of the President*,
215 F.3d 20 (D.C. Cir. 2000) ........................................................ 20, 21

*In re Flynn*,
973 F.3d 74 (D.C. Cir. 2020) ........................................ 1, 2, 18, 21, 23

*In re Kellogg Brown & Root, Inc.*,
796 F.3d 137 (D.C. Cir. 2015) ........................................................ 21

*In re Papandreou*,
139 F.3d 247 (D.C. Cir. 1998) ........................................................ 21, 25

*In re Sealed Case No. 98-3077*,
151 F.3d 1059 (D.C. Cir. 1998) ........................................................ 21

*In re Sealed Case,*
  121 F.3d 729 (D.C. Cir. 1997) ............................................................ 26

*In re Stone,*
  940 F.3d 1332 (D.C. Cir. 2019) ............................................................ 1

*In re U.S. Dep't of Educ.,*
  25 F.4th 692 (9th Cir. 2022) ............................................ 22, 27, 28, 32

*In re United States,*
  542 F. App'x 944 (Fed. Cir. 2013) .................................................. 27, 28

*Lederman v. New York City Department of Parks and Recreation,*
  731 F.3d 199 (2d Cir. 2013) ................................................................ 27

*Peoples v. Dep't of Agriculture,*
  427 F.2d 561 (D.C. Cir. 1970) ............................................................ 25

*Simplex Time Recorder Co. v. Secretary of Labor,*
  766 F.2d 575 (D.C. Cir. 1985) ...................................................... 24, 25

*Staub v. Proctor Hosp.,*
  562 U.S. 411 (2011) ............................................................................ 31

*Trump v. Mazars USA, LLP,*
  39 F.4th 774 (D.C. Cir. 2022) ............................................................ 28

*United States v. Morgan,*
  313 U.S. 409 (1941) .................................................................. 24, 26, 27

*Will v. United States,*
  389 U.S. 90 (1967) .............................................................................. 21

## Other Authorities

Order, *In re Murthy*, No. 22-30697 (5th Cir. Jan. 5, 2023) .............................. 26, 32

Order, *In re United States*, No. 14-5146 (D.C. Cir. July 24, 2014) ................. 31, 32

Office of the Inspector Gen., U.S. Dep't. of Justice, *A Review of Various Actions by the FBI and DOJ in Advance of the 2016 Election* (June 2018) ........................................................................ 11, 13, 14

Dep't of Justice Office of the Inspector Gen., *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations*, 21-127 (September 2021) .............................................................. 16

## INTRODUCTION AND SUMMARY

The government fails to make the extraordinary showing required for mandamus relief.  A mandamus petition must be denied unless: (1) the petitioner satisfies its "burden of showing that [its] right to issuance of the writ is 'clear and indisputable'"; (2) "the issuing court, in the exercise of its discretion, [is] satisfied that the writ is appropriate under the circumstances"; and (3) the petitioner has "no other adequate means to attain the relief."  *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004).[1]  "[M]andamus is 'drastic'; it is available only in 'extraordinary situations'; [and] it is hardly ever granted."  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005).

The basis of Defendants' Petition—that Judge Amy Berman Jackson clearly abused her discretion in permitting the limited deposition of Mr. Trump—finds no support in the record.  The district court issued a series of careful, well-founded rulings in deciding whether to authorize the deposition of Mr. Trump, an important third-party witness with unique knowledge of the events.  The court required Plaintiffs to describe with specificity each topic on which they would question Mr. Trump, allowed the government ample time to consider and object to these topics,

---

[1] *See also Illinois v. Ferriero*, 60 F.4th 704, 713-14 (D.C. Cir. 2023); *In re Stone*, 940 F.3d 1332, 1338 (D.C. Cir. 2019); *In re Flynn*, 973 F.3d 74, 78 (D.C. Cir. 2020) (*en banc*).

and provided an opportunity for the government to assert executive privileges before the deposition.  The government declined to assert those privileges.  The court concluded that Mr. Trump has unique personal knowledge and authorized a two-hour deposition limited to the narrow set of topics it had approved.  It also required Plaintiffs to depose every other relevant witness first.  These rulings—issued over the course of nearly a year—fall squarely within the appropriate bounds of the district court's authority to manage discovery, and Defendants cannot show that they have a "clear and indisputable" entitlement to the writ or that "the writ is appropriate under the circumstances."

The Petition fails on an additional ground: Defendants cannot show that Mr. Trump's deposition will cause irreparable harm to the executive branch, a prerequisite to the drastic remedy of mandamus.  When "ordinary appellate review … remains available, the writ may not issue unless the petitioner identif[ies] some irreparable injury that will go unredressed if he does not secure mandamus relief."  *In re Flynn*, 973 F.3d at 79 (quotation omitted).  But Defendants identify no harm whatsoever to the executive branch—let alone irreparable harm that cannot be corrected on appeal—that would result from permitting Mr. Trump, a former official whose testimony does not implicate executive privilege, to testify for two hours on the narrow set of topics approved by the district court.  Absent irreparable harm, the extraordinary remedy of mandamus is unavailable, and ordinary

appellate procedures provide "adequate means" to review a district court's interlocutory discovery orders.

Because the Petition fails on multiple grounds, the Court need not reach the merits of Defendants' "extraordinary circumstances" arguments. If the Court is inclined to address those arguments, however, the Petition fails there as well. There is no rule, much less a clear and indisputable rule, requiring "extraordinary circumstances" to depose a former high-ranking official when the purpose of the deposition is not to determine the official's deliberative process in making a decision within his purview, but to determine whether (as Mr. Trump has repeatedly boasted) the official injected himself into a personnel matter to retaliate against a civil servant. Although the Petition gestures towards separation-of-powers concerns, those gestures have little force given Defendants' admission that Mr. Trump's testimony implicates neither the presidential communications privilege nor the deliberative process privilege. Dkt. 108.[2] Moreover, Mr. Trump has not sought to block this deposition, and he has demonstrated through his private conduct—including the filing of a lawsuit against Mr. Strzok and Ms.

---

[2] Except where otherwise noted, docket numbers reference *Strzok v. Garland*, Case No. 1:19-cv-2367-ABJ. Ms. Page's case, *Page v. U.S. Dep't. of Justice*, Case No. 1:19-cv-3675-TSC (*Page*), is consolidated with Strzok's case for purposes of discovery.

Page—that he has sufficient time and energy to devote to these matters. *See Trump v. Clinton*, Case No. 22-cv-14102 (S.D. Fla.); Case No. 22-13410 (11th Cir.).

Regardless, the district court had ample basis to find that this case presents extraordinary circumstances. As it explained, Mr. Trump's "own contemporaneous and recent statements regarding his role" show that his testimony is "likely to lead to relevant evidence that can't be obtained elsewhere." Feb. 23, 2023, Hr'g Tr. 13, A19. These statements include interviews in which he "publicly boasted of his involvement" in Mr. Strzok's termination. July 6, 2023, Minute Order. Mr. Trump's involvement is likewise reflected in a documented meeting with then-Attorney General Sessions in February 2018, in which he talked about "firing [the] love birds," as well as testimony from then-White House Chief of Staff John Kelly that Trump made statements indicating his desire to see the FBI fire Strzok. *See* Kelly Decl. ¶¶ 1, 7, Dkt. 115-1 at 16-17 of 30. Similarly, contemporaneous news accounts reported that Trump met with both Sessions and FBI Director Wray to lobby for Strzok's firing. And his involvement is reflected in an extensive record of public statements in which he attacked Plaintiffs and excoriated the FBI for not yet having fired Strzok. There is also a wealth of circumstantial evidence that Trump's conduct influenced the FBI leadership, notwithstanding their unremarkable (and unconvincing) denials.

4

In short, the district court acted well within its authority in permitting Plaintiffs to depose Mr. Trump, for two hours, about his own knowledge and actions as they relate to Plaintiffs' claims. The Petition should be denied.

## STATEMENT

### I.     Procedural History

Mr. Strzok filed his Complaint in August 2019, asserting that the FBI violated his First and Fifth Amendment rights when it acceded to Mr. Trump's demands and fired him in part because of his political viewpoint and in violation of its established processes. Compl., Dkt. 1. Mr. Strzok also alleged that, in late 2017, Defendants violated the Privacy Act when they disclosed to the press text messages that Plaintiffs had exchanged on their FBI-issued cell phones. *See id.* Ms. Page filed a separate action in December 2019, likewise alleging that Defendants violated the Privacy Act. *Page* Compl. In September 2020, the district court denied Defendants' dispositive motions and directed the parties to proceed to discovery. Sept. 25, 2020, Minute Order.

Plaintiffs have not sued Mr. Trump, and Mr. Trump has not attempted to block his deposition. Counsel served a deposition subpoena dated November 26, 2021, through Mr. Trump's attorney. Defendants moved to quash in the Southern District of New York, and that motion was transferred to the District of Columbia

with Mr. Trump's consent to the transferee court's jurisdiction.  Dkt. 5, Case No. 1:22-mc-27.

On August 10, 2022, the district court issued a detailed ruling requiring Plaintiffs to depose former Associate Deputy Attorney General Scott Schools and former Deputy Attorney General Rod Rosenstein before deposing Director Wray and former President Trump.  *See* Aug. 10, 2022, Minute Order.  The district court's order required Plaintiffs to identify the questions they proposed to ask Mr. Trump and Director Wray, required the government to inform the court whether it would assert executive privilege, and required the parties to brief the executive privilege issues.  *Id.*

Defendants initially declined to ascertain "if the current President is going to assert executive privilege in all of the future depositions."  Aug. 10, 2022, Hr'g Tr. 13, Dkt. 86.  Instead, they filed a notice on October 18, 2022, that informed the district court what they would "likely" do in the "first instance" given the "'presumptive privileged nature' … to preserve the President's ability to perfect the privilege."  Dkt. 94 at 1.

On February 23, 2023, the district court held a second conference on the motions to quash.  Based on a thorough review of the record, including relevant depositions taken since the first hearing, the court determined "that the case presents extraordinary circumstances."  Feb. 23, 2023, Hr'g Tr. 11-12, A17-18.

6

The court—drawing on a deep knowledge of the facts—concluded that extraordinary circumstances justified a limited deposition of former President Trump. Those extraordinary circumstances included not only "the President's own contemporaneous and recent statements concerning his role" and the conflict between those statements and the existing testimony, but also that:

> [T]he firing decision was made at the highest level of the Department immediately under Director Wray, that it varied from the procedure that had been established and allegedly varied from agency regulations, that it varied from the decision of the officially designated decision maker, and that it varied from an agreement offered to and accepted by the plaintiff, and the fact that the proposed questions … as [the Court planned to] narrow them[], will not probe the operations or decisions made by the FBI, other than with respect to this one employment decision.

*Id.* 12-13, A18-19.

The district court limited the deposition topics to several key issues that are indisputably relevant to Plaintiffs' claims, explaining that this tailored approach would "ameliorate the potential impact on people being willing to work in the government in the future." *Id.* 14, A20. Specifically, the court limited Plaintiffs to two hours of questioning regarding:

- Discussions at three meetings on or about January 22 and 23, and June 15, 2018, related to "the text messages between the two plaintiffs or

the two plaintiffs in general, disciplining them, investigating them, et cetera." *Id.* 14-15, A20-21.[3]

- Mr. Trump's "own public statements and communications about the plaintiffs between December 2nd, 2017" and the present, "as well as any related communications about his statements with the Department of Justice or the FBI." *Id.* 15-16, A21-22.

- Whether Mr. Trump "retained the text messages, where he got them, what he did with them." *Id.* 16, A22.

The district court explained that its rulings were "not privilege rulings," *id.* 15, A21, and granted Defendants an additional month to ascertain whether President Biden would assert executive privilege. In March 2023, Defendants notified the court that "[t]he Executive Office of the President will not assert the Presidential Communications Privilege, and Defendants will not assert the Deliberative Process Privilege, with respect to the authorized topics." Dkt. 108.

Plaintiffs then engaged in a lengthy discussion with Mr. Trump's attorneys to find a workable deposition date. On May 10, 2023, Mr. Trump and Plaintiffs agreed to hold his deposition on May 24, 2023. *See* Dkt. 111-1 at 11 of 31. The next day, Defendants moved the district court to reconsider its February 23, 2023, order, and requested that Director Wray's deposition proceed before Mr. Trump's

---

[3] The district court used slightly different phrasing in addressing the January 23 and June 15 meetings, but it likewise limited the topics to discussion of "the plaintiffs." Plaintiffs were unaware of the February 21, 2018, and July 23, 2018, meetings identified by General Kelly's notes at the time of the February 23, 2023, conference, but Plaintiffs believe those meetings fall within the permitted topics as described in the district court's order and Plaintiffs' filings. Dkt. 89, 105.

8

deposition, notwithstanding Wray's ongoing responsibilities. Dkt. 110. The district court ordered the parties to conduct Wray's deposition first and complete it by June 2, even though "it was Director Wray, the only current high-ranking public official in the group of proposed deponents, whose ongoing essential duties fell most squarely under the protection of the doctrine in question." *See* May 12 and 15, 2023, Minute Orders. Defendants successfully sought to postpone Director Wray's deposition to June 27, 2023, *see* May 22, 2023, Minute Order, and, following the Wray deposition, again moved for reconsideration as to the Trump deposition, Dkts. 115-16. The district court denied that motion. *See* July 6, 2023, Minute Order. Defendants then filed the Petition.

## II.     Factual Background

### A.     Defendants disclose Plaintiffs' text messages to the press.

Plaintiffs are former employees of the FBI. Mr. Strzok served on active duty with the U.S. Army from 1991 to 1995, then continued serving in the U.S. Army Reserve until reaching his maximum service date. Compl. ¶ 13. After leaving active duty, he served as a distinguished FBI agent for more than 20 years, where he investigated some of the most significant threats to the country's national security and won awards as one the FBI's top counterintelligence agents. *See id.* ¶¶ 15-16. Ms. Page is a former government attorney who served in various roles at DOJ and FBI. *Page* Compl. ¶ 13.

9

In 2017, DOJ's Office of the Inspector General ("OIG") initiated a review of various actions by FBI and DOJ in connection with Secretary Clinton's use of a private email server (the "Midyear Exam").  As part of this review, OIG identified potentially "political" text messages that Plaintiffs had exchanged on their FBI-issued devices, including text messages referencing Mr. Trump and other political figures.  After OIG provided the messages to the FBI, Mr. Strzok was assured by the FBI's leadership, including Deputy Director Bowdich (who later fired him), that while Strzok would likely be "scathed" and that some of his actions might "splash" on the Bureau, Strzok would eventually return to an operational role.  *See* SA82.

On December 12, 2017, Defendants invited a group of reporters to Main Justice to review and report on Plaintiffs' private text messages, which were still under review by OIG.  The reporters were not permitted to make copies of the text messages or remove them from the building, and they were instructed not to identify DOJ as their source.  *See* Dkt. 36-13.  Mr. Trump and his allies immediately seized on the text messages as evidence of political bias.

In June 2018, OIG completed its review and issued a report, and the FBI agreed with OIG's conclusions that none of the investigative steps OIG had reviewed were "in any respect[] the result of bias or improper considerations" and that "there was no evidence of bias or other improper considerations affecting the

10

MATERIAL UNDER SEAL DELETED

handling of the Midyear Exam (MYE) investigation."[4]  By then, however, six

months had passed since the December 12, 2017 disclosure of Plaintiffs' text

messages, and it was too late to reverse its effects.

> **B.     Trump launches his campaign to destroy Plaintiffs' reputations
> and get Strzok fired.**

Following Defendants' disclosure of the text messages, President Trump

launched an extensive campaign that pressured DOJ and FBI to fire Strzok.  Trump

accused Strzok of being a member of the "deep state" and engaging in a "witch

hunt" against Trump, as well as committing "treason" and attempting a coup.

Compl. ¶ 47.

President Trump met with FBI Director Wray and Attorney General

Sessions.  As one news report stated, Trump "sharply questioned" Attorney

General Sessions and FBI Director Wray "during a White House meeting on

January 22 about why" Strzok and Page were still in their jobs and "pressed" Wray

and Sessions to "uncover derogatory information within the FBI's files."  Compl.

¶ 45.  The FBI produced a ███████████ in this litigation corroborating that

Director Wray was scheduled to attend █████████████████

█████████████.  *See* SA125.  And Trump reportedly met with Sessions

---

[4] Office of the Inspector Gen., U.S. Dep't. of Justice, *A Review of Various Actions
by the FBI and DOJ in Advance of the 2016 Election*, Attachment B at 1, 2 (June
2018) https://www.justice.gov/file/1071991/download.

MATERIAL UNDER SEAL DELETED

again the next day "and even more aggressively advocated that Strzok and Page be fired."  Compl. ¶ 45.

Director Wray's memory of these meetings is ▮▮▮.  He recalled a ▮▮▮  He did not recall the ▮▮▮ ▮▮▮ and while he recalled that ▮▮▮ ▮▮▮, Trump ▮▮ ▮▮▮ ▮▮▮.  Wray Dep. 14, 17-19, 22, A103-04, 107-09.  Wray emphasized during his deposition that his memory ▮▮▮ ▮▮▮.  *Id.* 11, A101.

In February 2018, Trump again met with Attorney General Sessions.  Notes of the meeting reflect a discussion of "- Investigations / - Firing love birds, / McCabe? / - Trust?"  *See* Kelly Decl. ¶ 7, Dkt. 115-1 at 17 of 30.  "President Trump generally disapproved of note taking in meetings" and was concerned "that the notes might later be used against him."  *Id.* ¶ 10.  Thus, much of what was said in these meetings is obscured by the limited recollections of attendees.  General Kelly was unable to "recall and date most of the statements" in which President Trump made clear that "he wanted to see Mr. Strzok fired," "questioned whether investigations by the Internal Revenue Service or other federal agencies should be

MATERIAL UNDER SEAL DELETED

undertaken into Mr. Strzok and/or Ms. Page," and "questioned whether Mr. Strzok and Ms. Page should have their security clearances revoked." *See id.* ¶¶ 1, 4-6.

President Trump also tweeted frequently about Plaintiffs and their continued employment at the FBI.  For example, on May 7, 2018, Trump tweeted "Lisa Page, who may hold the record for the most emails in the shortest period of time (to her Lover, Peter S), and attorney Baker, are out at the FBI as part of the Probers getting caught?  Why is Peter S still there?  What a total mess."  Compl. ¶ 46.  On June 5, he referenced "Strzok-Page, the incompetent & corrupt FBI lovers" and accused them of "SPYGATE."  @RealDonaldTrump, Twitter (June 5, 2018), https://tinyurl.com/2hevr5du.

Following the publication of OIG's Midyear Exam report on June 14, 2018, OIG formally referred Mr. Strzok and other unnamed FBI employees who had sent anti-Trump messages to the FBI's Office of Professional Responsibility for discipline, despite the report's finding that "no evidence of bias or other improper considerations" affected the investigation.  OIG observed that the problem of FBI employees sending political or inappropriate text messages was ███████

██████████ and that ████████████████████████████████████████

████████████████████████████████ and even then ████████████████

████████████████████████████████████████████████████████████

*See* SA73.  Yet, OIG and OPR proceeded with the disciplinary process against

**MATERIAL UNDER SEAL DELETED**

only ████████████████████████████████████████████████████████

████████.[5]  OIG identified Strzok and Page by name in its Midyear Exam report.

The other employees remained unnamed, ████████████████████████████

████████████████████████████.  *See, e.g.*, Will Dep. Ex.

73, SA53-72; *see also* SA126-36.[6]

     Within hours after a briefing from DOJ officials on the OIG report, President

Trump spoke on the North Lawn of the White House, stating:

> I'll tell you what — you're asking me about Peter Strzok
> being fired.  I am amazed that Peter Strzok is still at the
> FBI, and so is everybody else that read that report.  And
> I'm not even talking about the report; I'm talking about
> long before the report.  Peter Strzok should have been fired
> a long time ago, and others should have been fired.

Compl. ¶ 47.  The FBI proposed firing Mr. Strzok hours later.  Trump's attacks

continued throughout the summer of 2018.  For example, in early August, Trump

tweeted that Strzok, "should never, ever [have] been allowed to … remain in the

FBI[.]"  *Id.* ¶ 46.

---

[5] OIG's investigations also identified pro-Trump and anti-Clinton messages, ███
████████████████████████████████████████.

[6] Discovery has shown that numerous FBI employees who engaged in racist conduct
or used their FBI devices for open political advocacy received short suspensions or
a letter of censure.  For example, multiple employees who hung ████████████
████████████████████████████.  Will Dep. 403-06, SA34-37.

**MATERIAL UNDER SEAL DELETED**

### C. Trump's efforts succeed when the FBI reverses its independent disciplinary office's suspension of Strzok in an unprecedented move.

Mr. Strzok had a hearing before OPR Assistant Director Candice Will in July 2017.  As the long-time head of OPR, she was the appointed "deciding official" for Mr. Strzok's penalty.  She had █████████████████ █████████████ and ████████████████████████████████████ ████████████  Will Dep. 30, SA3.

Ms. Will accepted a "'last chance' adjudication agreement" under which Mr. Strzok forfeited his appellate rights for "a suspension of 60 calendar days" and modification to the charged offenses.  Dkt. 30-6.  The agreement stated, "the OPR Assistant Director's decision will constitute the FBI's FINAL decision in this matter, unless the matter is reopened based on credible evidence of a violation of this agreement."  *Id.*  Ms. Will's "final disposition" was dated August 8, 2018, and mailed the following day.  Dkt. 30-5.  OPR records indicate that at that point, the disciplinary action was ████████  Will Dep. 282, SA22.

In an unprecedented move, Mr. Bowdich then reversed Ms. Will's final decision.  Last chance agreements were an established final disciplinary outcome at the FBI, and "such agreements have been used throughout the federal

15

government."[7]  Ms. Will, who headed OPR for nearly 15 years, was ███████████

████████████████████.  Will Dep. 361, SA28.

The critical factual dispute is whether Mr. Bowdich's decision to overturn

Mr. Strzok's last chance agreement was affected by Strzok's privately expressed

political views or whether, as the FBI maintains, Bowdich's decision was based

strictly on violations of FBI policy.  Former President Trump has acknowledged

his hand in Strzok's termination.  Mr. Trump stated in December 2019 that he

considered "getting rid" of the FBI employees who led the Crossfire Hurricane

investigation one of his "greatest achievements."  Dkt. 36-2 at 31.  In January

2020, at a press conference, he said he thought what he had done "with the

insurance policy, with the horrible statements made between Strzok and Page" was

"going to go down as one of the greatest things [he had] done for our country."[8]

He took credit for having "fired Comey, that whole group" in December 2021, and

in February 2023 appeared on a radio show where he said:

> Don't forget, these guys, before I even got in, they were
> spying on my campaign, long before I got in.  This didn't
> just happen.  And if I didn't fire Comey, and *if I didn't
> fire McCabe and Strzok and Page* and all of that scum

---

[7] Dep't of Justice Office of the Inspector Gen., *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations*, 21-127 (September 2021), https://oig.justice.gov/sites/default/files/reports/21-127.pdf.

[8] *Donald Trump Holds a Press Conference Before Leaving Davos*, YouTube (Jan. 22, 2020), https://www.youtube.com/watch?v=xj4uCDNmg9Q (emphasis supplied, recording at 39:30).

> that was in there, you would have had, they were trying to
> do an overthrow.  And they, just think of it.  They spied on
> my campaign from the time I came down the escalator.
> And here I am, innocently running to do something great,
> and I have this garbage that's in there headed up by Comey
> and the group.  They spied on my campaign, and ***I got rid
> of them all. I got rid of them all***.

Dkt. 105 at 2.  The vast disparity between Strzok's firing and the lesser or non-

existent penalties imposed on similarly situated employees who sent ███████

██████████  who sent anti-Trump messages but whom Defendants did ████████

████████  suggests that FBI indeed capitulated to Trump's demands.

　　　Mr. Trump also took the time to imitate Mr. Strzok orgasming while reciting

his messages before thousands of fans at campaign events.  *See, e.g.*, FoxNews,

*Trump viciously mocks Strzok, Page at Minneapolis rally*, YouTube (Oct. 10,

2019) (over 293,000 views), https://tinyurl.com/4uvxknw6; C-span, *President

Trump Rally in Battle Creek, Michigan*, C-SPAN (Dec. 18, 2020),

https://tinyurl.com/2cxcx369 (recording at 1:05:40).  He personally initiated a

lawsuit against Mr. Strzok, Ms. Page, and others after leaving office.  And he has

attacked Plaintiffs and their families numerous times in media appearances, on

social media, and at campaign events.  *See, e.g.*, *@Real_RobN,* Twitter (Oct. 1,

2022, 11:25 PM), https://tinyurl.com/krmdxdwa.

**REASONS FOR DENYING THE PETITION**

I.   **Defendants cannot meet the high bar of showing that the district court's carefully tailored discovery orders amounted to a judicial usurpation of power.**

Defendants fail to show that they are entitled to the "drastic and extraordinary" remedy of mandamus, which is reserved for "really extraordinary causes." *In re Flynn*, 973 F.3d 74, 78 (D.C. Cir. 2020) (*en banc*); *see also In re Cheney*, 544 F.3d 311, 313 (D.C. Cir. 2008) ("[M]andamus is justified only in exceptional circumstances amounting to a judicial usurpation of power."). A mandamus petition must be denied unless: (1) the petitioner satisfies its "burden of showing that [its] right to issuance of the writ is 'clear and indisputable'"; (2) "the issuing court, in the exercise of its discretion, [is] satisfied that the writ is appropriate under the circumstances"; and (3) the petitioner has "no other adequate means to attain the relief." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004). "All three requirements must be satisfied, and the absence of any one compels denial of the writ." *In re Flynn*, 973 F.3d at 78.

   A.   **The district court acted well within its authority to manage discovery matters.**

Defendants do not come close to showing that they have a "clear and indisputable" right to issuance of the writ, nor have they established that it is "appropriate under the circumstances" to overturn the district court's careful and well-reasoned discovery orders.

18

The record shows that the district court, far from abusing its discretion or engaging in "a judicial usurpation of power," went to great lengths to address Defendants' concerns and tailor the requested discovery to the demonstrated need. The court sought extensive submissions from the parties, held multiple hearings, and thoroughly considered the parties' arguments, ultimately authorizing the narrow, time-limited deposition of Mr. Trump in February 2023. Since that ruling, Defendants have sought additional orders to enforce their preferred timing and sequence for the Wray and Trump depositions, and the court has largely granted those requests. *See* May 12 and 22, 2023, Minute Orders. For example, Defendants succeeded in delaying Mr. Trump's deposition until after Director Wray's, postponing the Wray deposition for several weeks past the court-ordered deadline, and derailing the May 24 date for the Trump deposition.

Having postponed Mr. Trump's deposition for as long as they could, Defendants now seek to quash it through mandamus review. But they provide no reason—and certainly not a "clear and indisputable" one—to second-guess the district court's judgment that Mr. Trump is an important third-party witness with unique knowledge of the relevant events. The public record and evidence developed in this litigation confirm that Mr. Trump has long been personally involved in matters relating to Mr. Strzok, Ms. Page, and their text messages. *See,*

19

*e.g.*, Compl. ¶¶ 44-49; *Page* Compl. ¶¶ 4, 34-60, 77-79.[9]  The district court acted

well within its authority in authorizing Plaintiffs to probe this involvement,

including Mr. Trump's communications with Defendants, his attendance at certain

meetings, and his handling and retention of the text messages.  Feb. 23, 2023, Hr'g

Tr. 15-16, A21-22.

In short, the district court is ably managing the discovery process in this

litigation, and the Court should reject Defendants' invitation to intervene.  *See In*

*re Cheney*, 544 F.3d 311 at 313 ("[G]iven the deference [this Court] owe[s] trial

courts in the management of their cases, that judgment is not remotely one from

which defendants have an indisputable right to relief." (citing *Berry v. Dist. of*

*Columbia*, 833 F.2d 1031, 1037 n.24 (D.C. Cir. 1987)).

## B.   Mandamus is unavailable where, as here, there is no showing of irreparable harm.

In evaluating whether a party has satisfied the high threshold for mandamus,

courts consider "whether the party seeking the writ has any other adequate means,

such as a direct appeal, to attain the desired relief," and "whether that party will be

harmed in a way not correctable on appeal."  *In re Exec. Off. of the President*, 215

---

[9] Apart from a conclusory footnote, the Petition largely ignores the Privacy Act claims.  Pet. 32 n.2.  Regardless, the district court authorized "the plaintiffs" to depose Mr. Trump, and the permitted topics include matters that are relevant to both sets of claims.  *See* Dkt. 111 at 6-7 (addressing "Ms. Page's Interest").

F.3d 20, 23 (D.C. Cir. 2000). "In the normal course, … mandamus is not available to review a discovery order," *id.*, and "[a] petition for a writ of mandamus 'may never be employed as a substitute for appeal,'" *In re Flynn*, 973 F.3d at 78 (quoting *Will v. United States*, 389 U.S. 90, 97 (1967)).

"When ordinary appellate review … remains available, the writ may not issue unless the petitioner identif[ies] some irreparable injury that will go unredressed if he does not secure mandamus relief." *Id.* at 79. Here, the government relies on a separation-of-powers rationale, *see* Pet. 21-25, and it therefore must show that "the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties," *In re Flynn*, 973 F.3d at 78-79.

As the Petition reveals, however, Defendants have no serious argument that the two-hour deposition of Mr. Trump would impair the executive branch.[10] Mr. Trump is not currently responsible for any government function, and the narrow

---

[10] The absence of irreparable harm distinguishes this case from those in which "mandamus relief may be appropriate to challenge a District Court's discovery order," such as cases involving the disclosure of privileged information. *In re Exec. Off. of the President*, 215 F.3d at 23; *see, e.g.*, *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015) (protecting privileged information); *In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998) (addressing immunity concerns); *In re Sealed Case No. 98-3077*, 151 F.3d 1059 (D.C. Cir. 1998) (protecting confidential grand jury information). In such circumstances, "appeal after final judgment is obviously not adequate," since "the cat is out of the bag." *In re Papandreou*, 139 F.3d at 251.

areas in which he might testify about his past actions do not implicate executive privilege. By explicitly representing that it would not assert executive privilege over any of the deposition topics, the government affirmatively relinquished that avenue to relief. *See Cheney*, 542 U.S. at 379 (laches "might bar a petition for a writ of mandamus"). In addition, Mr. Trump was personally involved in the events underlying Plaintiffs' claims, and he has demonstrated greater availability for civil litigation than the typical former president, even suing Mr. Strzok and Ms. Page. As the district court correctly recognized, permitting a two-hour deposition under these unique circumstances will hardly open the floodgates to discovery from high-ranking executive-branch officials.

Defendants posit that "[t]he threat of having to spend their personal time and resources preparing for and sitting for depositions could hamper and distract officials from their duties while in office," Pet. 24 (quoting *In re U.S. Dep't of Educ.*, 25 F.4th 692, 705 (9th Cir. 2022)), but the district court already considered and accounted for that factor, *see* Feb. 23, 2023, Hr'g Tr. 14, A20. Defendants' other arguments consist of little more than generalizations about executive-branch interests.

Tellingly, despite the government's professed concerns about the impairment of executive-branch functioning, it did not seek reconsideration of the district court's February 2023 order as to the deposition of Director Wray—a

22

current agency head with far greater official demands on his time. And earlier, in attempting to forestall the deposition of Mr. Trump, Defendants suggested that Plaintiffs should have to depose certain high-ranking officials *twice*. *See* Dkt. 94 at 1. This history suggests that Defendants' true goal is to block or delay Mr. Trump's testimony, not to ease the burdens on the executive branch.

Because Defendants cannot show that Mr. Trump's deposition would cause any harm—let alone irreparable harm—to the executive branch's ability to fulfill its constitutional duties, mandamus is unavailable. *See In re Flynn*, 973 F.3d at 79; *id.* at 101 (Rao, J., dissenting) ("The mandamus standard … treats the harm and adequate remedy as two sides of the same coin.").

## II. It is not clear and indisputable that the "extraordinary circumstances" test applies.

It is not indisputable that extraordinary circumstances are necessary to compel the limited deposition of a former official under these circumstances. And even if that standard applied, it was satisfied here, as the district court correctly concluded. *See* Section III, *infra*. The former president's repeated public claims that he is responsible for Mr. Strzok's firing, which are consistent with other reliable evidence (including contemporaneous notes), are—and hopefully will remain—extraordinary.

Regardless, for three reasons, it is not "clear and indisputable" that the high standard under which Plaintiffs prevailed in the district court applies. *First*, the

23

deposition does not seek the former president's reasons for taking an official action within his purview; rather, it seeks to determine whether he improperly influenced official action by the FBI Deputy Director. *Second*, where the government has waived executive privilege, the testimony of a former official does not present separation-of-powers concerns. Deposing a former official does not burden or interfere with government operations, and the government has no stake in shielding a former official from a two-hour deposition on carefully narrowed topics. *Third*, no binding precedent or persuasive authority clearly and indisputably establishes that extraordinary circumstances are required to depose a *former* official (although, as the district court determined, Plaintiffs prevail even under that standard).

### A. The former president was not the official decisionmaker, and the deposition is not about his deliberative process.

The rule the government asks this Court to enforce does not clearly and indisputably apply. This Court derived the rule it described in *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575 (D.C. Cir. 1985), from *United States v. Morgan*, 313 U.S. 409 (1941), where the Supreme Court approved an administrative court's exercise of its discretion in refusing to call the sitting Secretary of Labor as a witness to testify about "the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates." *Id.* at 422. *Morgan* concerned protecting from discovery the deliberative process of the decisionmaker beyond the

24

reasons stated for the decision in the agency record. But here, the former president was not the appropriate decisionmaker—FBI employees were. The question is whether the former president played a role, as he has publicly claimed to have done, in a decision in which the president rightly had no part. Moreover, in *Simplex Time Recorder*, the officials had "no personal knowledge of the facts surrounding th[e] particular case," and there was "no urgent or proper need" to question them. 766 F.2d at 580, 587.[11]

**B.     By declining to assert the privileges that safeguard the separation of powers, Defendants have effectively conceded that no separation-of-powers concerns exist.**

The Petition gestures towards separation-of-powers concerns but fails to explain how they will be impaired by the former president's deposition. The government had the opportunity to assert the deliberative process privilege and the

---

[11] The government's other citations do not further its cause. *See In re Cheney*, 544 F.3d at 314 ("no need" to depose current high-ranking official where information "could be obtained elsewhere"); *In re Papandreou*, 139 F.3d at 254 (there were "no findings by the district court explaining why [the] depositions . . . [were] necessary," "lots of indications that they [were] not," and "[a]lternatives seem[ed] ample"); *Peoples v. Dep't of Agriculture*, 427 F.2d 561, 567 (D.C. Cir. 1970) (discussing district court's wide latitude to manage discovery). Defendants also rely on the Supreme Court's stay of a deposition of the Secretary of Commerce in litigation over the decision to add a question to the decennial census. S*ee* Pet. 21, 23 (citing stay ruling). It is far from clear, however, that the Supreme Court's stay order was based on the standard for deposing a high-ranking official rather than the more general *Overton Park* doctrine requiring a strong showing of bad faith before taking any discovery outside the administrative record. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-74 (2019) (quoting *Overton Park*).

presidential communications privilege, both of which protect executive branch

interests, but declined to do so.  *In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir.

1997) (presidential communications privilege is "inextricably rooted in the

separation of powers under the Constitution").  The Executive Office of the

President and Defendants made that choice after being given a month to carefully

consider the issue.  Dkt. 108.  They then waived the privileges by permitting

testimony, to the limited extent of the deponents' recollection, about the identified

topics.[12]

### C. No binding precedent or persuasive authority clearly and indisputably establishes that extraordinary circumstances are required to depose a former official.

Even setting aside the government's executive privilege position, which

defeats its reliance on *Morgan* and its progeny, there is no clear and indisputable

rule that the "extraordinary circumstances" standard applies to *former* officials.

This Court has held that "[t]he duties of high-ranking executive officers should not

be interrupted by judicial demands for information that could be obtained

elsewhere."  *In re Cheney*, 544 F.3d at 312.  But the information sought here

cannot be obtained elsewhere, and no official actions will be "interrupted."

---

[12] The former president received notice and also elected not to assert executive privilege.  *See* Dkt. 108.

In the Fifth Circuit's decision in *In re Murthy*, No. 22-30697 (5th Cir. Jan. 5, 2023), the parties appear not to have raised the applicability of the standard as to the former White House press secretary, and the decision rests on other grounds. And in *Lederman v. New York City Department of Parks and Recreation*, 731 F.3d 199 (2d Cir. 2013), the Second Circuit affirmed, on direct appeal, the entry of protective orders blocking the depositions of the former Mayor and Deputy Mayor without addressing whether the extraordinary circumstances rule should extend to former officials.

*In re U.S. Department of Education* also does not support the mandamus relief the government seeks here. *See* 25 F.4th 692 (9th Cir. 2022).[13]  The opinion—issued by a divided panel—was motivated by the need to protect from unnecessary discovery the official's justified participation in her own agency's deliberative process.  To hold that the extraordinary circumstances standard applied, the Ninth Circuit relied on dicta from a Federal Circuit decision: "We note that the process-inquiry rationale of *Morgan* and its successors hardly becomes inapplicable upon an official's departure from [her] office."  *Id.* at 705 (citing *In re*

---

[13] The mandamus standard that the Ninth Circuit applied, based on five non-exhaustive factors, differs from the mandamus test the Supreme Court and this Court apply.

27

*United States*, 542 F. App'x 944, 949 (Fed. Cir. 2013)).[14] And the majority's explanation of why the extraordinary circumstances standard extends to former officials was not beyond reproach—it was not even convincing. *See id.* at 707-08 (9th Cir. 2022) (Paez, C.J., dissenting) ("The majority dismisses the distinction between a current and former secretary in four brief sentences when, in fact, the rationales behind the 'extraordinary circumstances' doctrine do not have the same force in the context of a former official."). The government's cases do not articulate a clear and indisputable rule that controls, especially because Mr. Trump was not the official decisionmaker and executive privileges do not apply.

To the contrary, this Court has confirmed that subjecting the President to discovery is different in kind from subjecting a former president to discovery. *See Trump v. Mazars USA, LLP*, 39 F.4th 774 (D.C. Cir. 2022). As it noted in addressing a congressional subpoena for the former president's financial records: "Now that President Trump is out of office, any burdens the Committee's subpoena imposes on him will no longer distract the head of the Executive Branch. That is significant in view of the Supreme Court's emphasis on avoiding

---

[14] The Federal Circuit decision was clear that it was not deciding the standard for deposing a former official. *See In re United States*, 542 F. App'x at 949.

unnecessary intrusion into the operation of the Office of the President." *Id.* at 806.[15]

## III.  Regardless, extraordinary circumstances justify the limited deposition of Mr. Trump.

Even assuming the "extraordinary circumstances" standard applies, Defendants cannot show that the district court clearly abused its discretion in determining that this case presents extraordinary circumstances.

The decision to overrule the last chance agreement and fire Strzok was extraordinary on its face.  The Deputy Director's rejection of the agreement accepted by OPR Assistant Director Will was unprecedented.  The record does not identify any comparable discipline of FBI agents for privately expressing political views on official devices (despite numerous employees who did so).  The action is also extraordinary because of Trump's repeated public assertions that he got Strzok fired, the presence of contemporaneous records showing that Trump discussed firing him, and Trump's yearslong campaign of public attacks on Plaintiffs, both as a sitting president and since.

The district court appropriately accepted the former president's public claims that he was responsible for Mr. Strzok's firing for the purposes of its ruling,

---

[15] The government cites *In re Clinton*, 973 F.3d 106, 112-13 (D.C. Cir. 2020), to suggest that their preferred rule applies to former officials.  That opinion does not even mention "extraordinary circumstances."

and Mr. Strzok is entitled to elicit that testimony and offer it for its truth.  This

inquiry is especially appropriate given that Trump's claims are corroborated by

evidence that he discussed the matter with DOJ officials.  The exact basis for

Trump's public statements taking credit for Strzok's termination, of course, can be

determined only by asking him under oath, and the district court was therefore

indisputably correct that his deposition is "likely to lead to relevant evidence that

can't be obtained elsewhere."  Feb. 23, 2023, Hr'g Tr. 13, A19.

Extensive evidence indicates that Trump's testimony will be critical for

Plaintiffs.  Reputable reports asserted that Trump pressed for Strzok's termination

during multiple meetings in January 2018.  Contemporaneous notes show that he

discussed "firing [the] love birds" at another meeting.  The recollections of

deponents so far have been incomplete.  *See, e.g.*, Rosenstein Dep. 379, SA76 █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

The district court's decision to allow a limited two-hour deposition in these unique

circumstances does not open the door to routine depositions of sitting or former

presidents or other senior officials.

**MATERIAL UNDER SEAL DELETED**

It is also extraordinary that the former president's personal conduct since leaving office so clearly demonstrates that he has two hours to spare for this deposition. His continued attacks on Plaintiffs, his public statements about the events at issue, and his decision to sue Plaintiffs cannot reasonably be considered ordinary conduct.

Moreover, even setting aside the open questions about how extensively Trump personally pressed for Strzok's termination during the identified Oval Office meetings, it is undisputed that Trump ███████████████████████ ███████████████ *id.* at 393, SA80, and his "[a]nimus and responsibility for the adverse action can both be attributed to" the FBI if Strzok's termination was "the intended consequence" of his actions. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011); *see also Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 135 (1992) (even public speech cannot be suppressed "simply because it might offend a hostile mob"). Defendants are not entitled to quash relevant discovery on this issue merely because their employees do not recall a specific directive from Trump. *See Staub*, 562 U.S. at 419 ("The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes."). If anything, that Mr. Trump's testimony is likely to contradict the testimony of Defendants' employees highlights its importance to this case. The district court was correct to allow the narrow and

highly relevant discovery at issue.  *See Cruz v. McAleenan*, 931 F.3d 1186, 1193 (D.C. Cir. 2019).

This case could not be more different from the only in-circuit decision the Petition cites granting mandamus to block a deposition of a *sitting* official for a clear and indisputable failure to show extraordinary circumstances.  In the Vilsack case, *see In re United States*, No. 14-5146 (D.C. Cir. July 24, 2014), the district court ordered a deposition of a sitting member of the Cabinet before requiring, and as a substitute for, other discovery in a private diversity action, *see* Reply ISO Petition for a Writ of Mandamus 1-2, Doc. #1501503 (July 9, 2014) ("sole purpose" of the Secretary's deposition was to narrow overall scope of discovery). That is simply not comparable to the facts here, where Plaintiffs have taken extensive discovery and Mr. Trump's public statements show he has unique knowledge that cannot be obtained elsewhere.[16]

This Court's earlier decision in *In re Cheney*, 544 F.3d 311, illustrates why the district court's order fell well within its range of discretion.  There, the Court

---

[16] The out-of-circuit cases the government cites also fail to show that it is clearly and indisputably entitled to the writ.  In *Murthy*, the Fifth Circuit noted that the parties agreed "that Psaki's deposition was unnecessary at [that] time," but the district court authorized it anyway.  *Murthy* Order at 4.  In the *Department of Education* case, the Ninth Circuit held that the plaintiffs had established the agency's bad faith, and the deposition was concededly unnecessary.  25 F.4th at 703-04.  Further, the Ninth Circuit noted that, as in this Court's Vilsack case, the plaintiffs had not even tried alternative means.  *Id.* at 704-05.

ruled that the scope of the deposition the district court had authorized to address the Vice President's record retention policies was "appropriately narrow," 544 F.3d at 314. However, it ordered the substitution of the Vice President's *deputy* Chief of Staff for the Chief of Staff as a deponent because the lower-ranking official was "more logically suited to clearing up lingering questions." *Id.*

The government has not (and cannot) point in this case to a viable substitute for the former president's testimony. Only the former president himself can explain his statements about Plaintiffs, including his statements taking credit for Mr. Strzok's termination. These circumstances are extraordinary, and the district court acted well within its discretion in reaching that conclusion.

In any event, *sui generis* fact patterns layered atop unsettled legal issues are not the stuff of mandamus. *In re al-Nashiri*, 791 F.3d 71, 82-86 (D.C. Cir. 2015) ("Even if we ultimately agreed with [the petitioner] on the merits, mandamus would not lie because the answer was hardly 'clear' *ex ante*.") (quotation omitted).

## CONCLUSION

For the reason stated above and those set forth in the district court orders under review, the Petition should be denied.

Dated: August 2, 2023

Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress
Robert J. Katerberg
Kaitlin Konkel
**ARNOLD & PORTER KAYE SCHOLER
LLP**
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
Amy.Jeffress@arnoldporter.com
Robert.Katerberg@arnoldporter.com
Kaitlin.Konkel@arnoldporter.com

*counsel for Lisa Page*

/s/ Aitan D. Goelman
Aitan D. Goelman
Christopher R. MacColl
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, DC 20036
(202) 778-1800
agoelman@zuckerman.com
cmaccoll@zuckerman.com

Richard A. Salzman
**HELLER, HURON, CHERTKOF &
SALZMAN PLLC**
1010 Wayne Ave., Suite 510
Silver Spring, MD 20910
(202) 293-8090
salzman@hellerhuron.com

*counsel for Peter Strzok*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the word limit of Fed. R. App. P.

21(d)(1) because, excluding the parts of the document exempted by Fed. R. App.

P. 32(f), this document contains 7777 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

s/ Aitan D. Goelman
Aitan D. Goelman

35

## CERTIFICATE OF SERVICE

I hereby certify that, on August 2, 2023, I electronically filed the foregoing

document via the Court's CM/ECF system.

I further certify that, on August 2, 2023, the foregoing document was served

on the following counsel via the Court's CM/ECF system:

Brian M. Boynton
Mark R. Freeman
Gerard Sinzdak
Martin Totaro
Attorneys, Appellate Staff
Civil Division, Room 7525
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
brian.m.boynton@usdoj.gov
mark.freeman2@usdoj.gov
gerard.j.sinzdak@usdoj.gov
martin.v.totaro@usdoj.gov

*Counsel for Petitioners*

I further certify that, on August 2, 2023, two copies of the foregoing

document were printed and will be delivered to the Honorable Amy Berman Jackson,

United States District Judge for the District of Columbia.

s/ Aitan D. Goelman
Aitan D. Goelman